# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

RENEE M. BENDLIN,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C09-4098-PAZ

**MEMORANDUM OPINION AND ORDER**

---

      This matter is before the court for judicial review of a decision by an administrative law judge ("ALJ") denying the plaintiff's applications for Disability Insurance benefits ("DI") under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. The plaintiff Renee M. Bendlin claims the administrative record does not contain substantial evidence to support the ALJ's decision that she is not disabled.

      Bendlin protectively filed applications for DI and SSI benefits on December 17, 2007, alleging a disability onset date of September 21, 2007. Her claims were denied initially and on reconsideration. She filed a request for hearing, and a hearing was held on March 25, 2009, before an ALJ. Bendlin was represented by an attorney at the hearing. Bendlin and a vocational expert ("VE") testified. On June 10, 2009, the ALJ issued his decision, finding that although Bendlin has severe impairments consisting of a bulging disc at L4-5 and obesity, her impairments do not reach the Listing level of severity. He found she retains the residual functional capacity to perform her past relevant work as a small products assembler and cashier checker, and he therefore concluded she is not disabled.

Bendlin filed a timely Complaint in this court, seeking judicial review of the ALJ's decision. On February 5, 2010, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). The court first will summarize the testimony at the ALJ hearing, and the other evidence in the Record.

### Hearing Testimony

At the time of the ALJ hearing, Bendlin was thirty years old. She is 5'7" tall, and at the time of the hearing she weighed around 240 pounds, which was down from about 280 pounds in September 2007. She and her two children, ages nine and seven, live in Royal, Iowa, in a house owned by her parents. Immediately prior to her ALJ hearing, she had testified at a hearing on behalf of her seven-year-old daughter. Consequently, she had been sitting for about forty-five minutes, and she stated she was having muscle spasms and pain in her back. She was only able to get up on her own by using a table and chair to support herself.

Bendlin graduated from high school in 1997. She worked at a K-Mart in Spencer, Iowa, off and on for almost five years. At various times she worked as a cashier, retail clerk, shelf stocker, and truck unloader. She quit the job because the nighttime hours were

not compatible with caring for her children and husband. For the next year, she stayed at home and raised her son, occasionally doing daycare work. Then she got a full-time job at Heartland Foods, and she also worked part-time at Head Start. At the grocery store, she unloaded 100-pound boxes from a pallet jack, opened them, and unpacked them. She sometimes marinated meat and pressed meat. She stated she was "kind of a floater going all over the place." She worked about sixty hours a week.

When Heartland Foods closed down, Bendlin went back to school. She completed two years of college and earned an Associate of Science degree in Human Services and Disability. Her intention at the time was to work with mentally ill people to assist them with rehabilitation. While she was in school, she worked as a sales clerk at Trade Home Shoes, where she assisted customers, stocked shelves when the weekly deliveries came in, and performed other tasks as needed. She left that job to complete a practicum that was required for her degree.

After she graduated in the spring of 2006, Bendlin started working part time through the Upper Des Moines Opportunity Council. She worked as a facilitator with the Just Friends program, a group that met five days a week for three hours a day at a church in Spencer, Iowa. She described the group as a place where "people with mental illnesses can come in . . . [and] have a safe environment." She cooked lunch for the group members, fed them as necessary, played games with them, picked up after them, did the grocery buying each week, and made sure the room was clean each day. She usually worked from eighteen to twenty hours a week.

Bendlin's health problems began in December of 2006, when she slipped on some ice while shoveling snow at her home, causing her to fall and injure her back. Her back hurt but she did not think it was serious, and she continued working at Just Friends. She stated that occasionally she would move and her back would not feel right, but it did not prevent her from working. Then in July 2007, she slipped in the bathroom at a park where

she was camping with her family. She twisted and tried to catch herself. She stated that later that night, her back "[j]ust kind of locked up," she could not move, and her legs were hurting. She stated that since then, "it's just been a battle."

She tried to keep working at Just Friends, but it made her back hurt worse. Her doctors eventually limited her to three days a week, and because of this and her ongoing pain, she quit the job. After her July 2007 injury, she initially went to her family doctor, Dr. Feldman, who ordered an MRI of her back, put her on "a really high dose of steroids," and prescribed Percocet. He also gave her a total of three epidural injections in her back. Eventually, Dr. Feldman referred her to a specialist, Dr. Pruitt. He continued her on the Percocet for awhile, but it caused her to sleep excessively. On one occasion, her children were unable to wake her up, and they had to call Bendlin's mother for help. Bendlin was on the Percocet for about six months, altogether, before she stopped taking it on her own because she was afraid to continue taking it. Dr. Pruitt also tried, at various times, Valium, Tylenol II, a TENS unit, and a back brace, but nothing has relieved Bendlin's pain to any significant degree. Dr. Pruitt imposed restrictions on Bendlin that included lifting no more than 25 pounds; only occasionally standing, walking, and sitting; and no standing, walking, or sitting for more than two hours at a time without a break.

Dr. Pruitt referred Bendlin to a local neurologist, and then to neurosurgeon Dr. Mark Fox in Sioux Falls, South Dakota, who sent her to Dr. Judith Peterson, a rehabilitation and pain management specialist. Dr. Peterson advised Bendlin to stop working altogether.

Bendlin went to the Mayo Clinic at one point, on referral from Dr. Pruitt. According to Bendlin, doctors at the Mayo Clinic wanted to put her "in a three week like mind control pain clinic," inpatient, but by that time Bendlin was divorced, and she had no one to care for her two children for that length of time.

A short time before the ALJ hearing, Bendlin fell and reinjured her back. She saw Dr. Feldman, who gave her a Demerol injection and ordered a repeat MRI that showed a disc herniation at L4-L5, and degenerative changes at L4, L5, and L5-S1. She was referred back to Dr. Reeder, whom she saw in late January 2009. He "advised her to avoid surgical intervention," and recommended she begin aerobic exercises and avoid the use of narcotics.

Bendlin does not believe she could perform any type of full-time work because of her back pain. She is on a Lidoderm patch, regular doses of Ibuprofen 800 mg, and occasional Lortab, all prescribed by Dr. Feldman. She also occasionally takes "Tylenol with arthritic medicine in it," an over-the-counter medication. She uses a TENS unit three to four times a week, for a couple of hours at a time, and she wears a back brace whenever she tries to vacuum or do dishes. She is unable to walk around the block without taking breaks to relieve the pressure in her back, and she can only walk for five to ten minutes before she must stop due to pain. When she sits, she puts the weight on her left side because her lower back and hip pain is primarily on the right. Her back pain also affects her ability to concentrate. Bendlin admitted her doctors have told her that her weight aggravates her back condition, and losing weight would help her back pain. However, she had not noticed any improvement after losing the forty pounds.

Bendlin also was seeing a psychiatrist for treatment of depression and ADHD. She was taking Cymbalta for depression and Adderall for ADHD. She started seeing the psychiatrist to deal with the depression caused by her ongoing back pain, which she indicated has "just taken over [her] life." She saw a counselor for awhile but had problems scheduling the appointments, but she continued to see the psychiatrist for medication management.

The ALJ noted that Bendlin had a noticeable limp. Bendlin stated the limp had been present for about a year. The psychiatrist's notes consistently record the limp, but

Dr. Reeder's notes indicate Bendlin was "walking well," and she could "walk on heels and toes and ascend[] a step bilaterally." Bendlin could not explain the discrepancy, noting the limp was present when she saw Dr. Reeder.

The ALJ asked the Vocational Expert to consider an individual of Bendlin's age and work history, with a medically-determinable impairment that would limit her consistent with Bendlin's testimony, if her testimony were found to be fully credible. The VE indicated Bendlin's inability to perform even a sedentary occupation would rule out all work. She also would be unable to perform any full-time work if her limitations were found to be consistent with the functional capacity assessment, which included significant limitations in sitting and standing.

However, looking at the state agency assessment, if she were able to lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit, with normal breaks, for about six hours in a regular work day; push or pull without limitation; perform all postural activities occasionally except climbing ladders, ropes, or scaffolds; and avoid concentrated exposure to extremes of cold, vibration, and hazards; then she would be able to perform light work in a controlled-temperature environment. The VE indicated this would be consistent with Bendlin's past work as a small products assembler and cashier checker, and she also could perform "the majority of light unskilled jobs."

### Summary of Medical Evidence

On July 17, 2007, Bendlin saw Bruce A. Feldmann, M.D. with complaints of back pain. She had seen Dr. Feldman in December 2006 and January 2007, for back pain, and thereafter had seen a chiropractor and received a course of physical therapy. She had been improving but her pain had been increasing gradually over several months, and she recently had slipped and caught herself, causing the pain to worsen. She reported pain "down to her knee and to her foot at times," greater on the right side than the left, and

back pain, also greater on the right side than the left. She indicated she had pain with movement, flexing, and rotating, and her most painful position was sitting up. She was directed to take Ibuprofen as needed, and the doctor also prescribed Lortab. He ordered an MRI scan of Bendlin's lumbar spine. She received epidural steroid injections on July 25 and August 1, 2007.

On July 31, 2007, Bendlin returned to see Dr. Feldmann for follow-up. Bendlin's MRI had shown "a herniated disk in her back." She had experienced short-term relief from the epidural injections but now reported feeling even worse then before. She was taking Ibuprofen and Lortab with little relief. The doctor stopped the Lortab and prescribed Percocet. Bendlin was scheduled for a nerve root injection, which was performed on August 27, 2007.

On September 4, 2007 Bendlin saw orthopedist Alexander Pruitt, M.D. He had seen Bendlin on August 3, 2007, and had prescribed bed rest, Tylenol #3, and Valium. She had an epidural injection on August 8, 2007, but by August 17, 2007, when he saw her for follow-up, she was still in considerable pain and could not get up out of a chair. She was tried on Percocet and a lumbosacral corset, and she received a single nerve root injection at L5 on the left. She only got relief for about the first eight hours after the injection before the pain returned. Dr. Pruitt indicated Bendlin's MRI showed "pretty significant disc herniation." He referred her to an orthopedic surgeon for consultation with regard to a possible discectomy.

On October 2, 2007, Bendlin saw Ralph Reeder, M.D. for evaluation of "severe lower back pain with central bulging disk at L4-L5 and L5-S1 with mild facet disease at both levels." Notes indicate Bendlin was 5'7" tall and weighed 276 pounds. Bendlin reported that her back problems began the previous winter after she slipped on the ice. She then reinjured herself in July 2007, when she slipped on a wet floor and fell. She reported aching into her legs, around her hips, and down the backs of her thighs. She

rated her low back pain as averaging 6/10, increasing to 10/10 about three times per week. She had been treated with epidural floods, sacroiliac joint injections, and facet injections; pain medications including muscle relaxants, Tylenol with codeine, Medro Dosepak, and Endocet; and a lumbosacral corset. She was walking with the assistance of a cane.

Upon examination, Bendlin was noted to be "clearly in great deal of distress secondary to the back pain." The doctor's notes are confusing, first indicating that Bendlin exhibited active muscle spasms in her back with "the slightest movement," but later stating she had "no active spasm" in her back but tensed up with mild palpation. She was noted to walk "with a great deal of pain behavior . . . hunched over and prefers using a cane." Although the motor exam showed she had full strength throughout, she nevertheless had "difficulty standing on heels or toes or ascending a stair in spite of the absence of marked weakness." Dr. Reeder examined an MRI of Bendlin's back, and noted the study showed a bulging disk at L4-L5, not severely compressing any nerve roots; mild facet disease at L4-L5; and a minimal bulge at L5-S1 with more pronounced facet arthropathy.

Dr. Reeder reached the following conclusions from his examination of Bendlin:

> An extensive conversation was held regarding the anatomy of the back and potentials for treatment. I have urged non-operative management. I feel a diskectomy would not help relieve her pain and I feel that her findings are not severe enough to warrant fusion or disk arthroplasty this early into the development of her pain. I have encouraged her to continue with the exercises she has been taught and to use the medications currently prescribed. She may benefit from a short course of sustained-release narcotics. All existing technology was discussed including dynamic stabilization and its current approval status, the possibility of a total disk arthroplasty, and the controversies regarding diskography.

R. 225, 306.

Dr. Pruitt prescribed a trial of a TENS unit, which Bendlin obtained on October 16, 2007.

On October 24, 2007, Bendlin saw Dr. Feldmann for a complaint of pedal edema for two weeks. The doctor opined Bendlin's recent use of anti-inflammatories for her back pain could be contributing to the swelling. He prescribed knee-high compression stockings and Spironolactone, and advised Bendlin to limit her use of Ibuprofen.

On October 29, 2007, on referral from Dr. Pruitt, Bendlin saw Mark W. Fox, M.D. for a consultation regarding her "back and occasional right leg pain with numbness and tingling of her toes." She was noted to be 5'7" tall and weighed 260 pounds. Bendlin exhibited discomfort when changing from sitting to standing and back to sitting. She had some mid diffuse tenderness upon palpation of her back, greater on the right side, but no focal motor sensory loss of her lower extremities. Dr. Fox was unable to reach any definitive conclusion regarding the cause of Bendlin's back and leg pain, although he indicated the pain possibly could be related to annular tears at L4 or L5.

In his report to Dr. Pruitt, Dr. Fox stated, "At this time, I am not sure if I understand her pain. She does have some central disc bulging at the fourth and fifth levels, but I can not state with certainty that this is causing her symptoms." R. 296. He recommended Bendlin undergo an EMG with nerve conduction study to rule out radiculopathy and peripheral neuropathy. He apparently did not have the benefit of more recent x-ray studies, noting that he had reviewed films from July 2000, which did not suggest surgery would benefit Bendlin. Bendlin underwent the EMG/peripheral nerve conduction study on November 27, 2007. The study was normal. Dr. Fox recommended a trial of Neurontin, and a referral to Dr. Judith Peterson, a chronic pain management specialist.

Bendlin saw Dr. Peterson on December 12, 2007. She prescribed a trial of Lidoderm patches and Neurontin, as well as aquatic therapy. She noted that on examination, Bendlin exhibited "significant right lumbosacral spasm . . . with an elevated right iliac associated with her antalgic gait," and she indicated that as Bendlin's pain

improved, a repeat trial of physical therapy would be appropriate. She also noted that due to Bendlin's significant muscle spasms, she was "a good candidate for a trial of Botox." R. 329.

Bendlin began a course of physical therapy on December 20, 2007. The physical therapist noted the following history of Bendlin's problems:

> The patient is a 29-year-old female who presents with persistent back and leg pain. She reports her initial injury occurred in December of 2006 when she fell on the ice. She did have some physical therapy at that time and chiropractic treatments, which got her some better, but never fully improved. Then, in July, she slipped on the bathroom carpet and twisted, catching herself and her pain has [been] persistent since that time. It has varied in intensity, but it is always constant. It has now gotten to a point where she has difficulty reaching over to pick anything up. She has problems even passing gas or wiping herself. She feels like she has difficulty shifting her weight off of the leg. She feels very limited with prolonged sitting, standing and walking without severe shooting pain on the right leg and across her low back bilaterally. She feels just sitting her back feels like it is all balled up. She has been sleeping very poorly. In the morning, she is quite stiff. She has poor mobility. She struggles just to move her leg with shooting pain in her back. Over the course of her injury, she had to let go of her job in September and just finally had to resign due to her back pain. She does report some intermittent tingling into the legs into the great toe. She has weakness especially through the right lower extremity. She states that it does ease some of her discomfort when she lies down. She feels very functionally limited with dishes, walking very far or tying her shoes. She has difficulty handling any type of laundry or light house duties such as vacuuming. Initially, she had undergone an MRI and x-rays which revealed the L4-L5 HNP. She did state that she underwent an EMG study and there was no lower leg nerve damage. The patient has had previous physical therapy, as well as chiropractic treatments. She has tried some heat and ice, as well as a TENS unit and a back brace. She has a chair

> massager at home and her parents['] hot tub to try to control
> som[e] of her discomfort. She states it all helps some, but
> nothing lasting. Previous level of function: She states prior to
> July, she was able to handle her job, but was never totally
> pain-free. The patient is rating her pain at 9 out of 10.
>
> Her goals are to be able to do every day activity.

R. 257. Bendlin further stated she had tried Percocet, Neurontin, and lidocaine patches for her pain.

The physical therapist prescribed treatment consisting of aquatic therapy, soft tissue and joint mobilization, flexibility training, postural training, and home exercise guidance, with therapy sessions two to three times weekly for eight weeks.

On January 11, 2008, Alexander Pruitt, M.D. wrote a letter to the state agency regarding Bendlin's application for disability benefits. He reviewed Bendlin's history and treatment since her referral to him in August 2007. He indicated Bendlin was wearing a corset and a TENS unit, without much improvement in her symptoms. He listed Bendlin's restrictions as follows: "She does have lifting and carrying restrictions, which include no lifting greater than 25 lbs and we put on an occasional basis standing, walking and sitting. We put her on no standing, walking or sitting for more than 2 hours at a time without a break. Stooping and climbing shouldn't give her a problem. Kneeling may give her some problems. We would only recommend that occasionally." R. 282.

Bendlin returned to see Dr. Peterson on January 21, 2008. She continued to report "significant difficulty with pain that affects her activities of daily living such as: Dressing, she has difficulty shaving her legs, she has difficulty standing to do dishes, and she finds it difficult to vacuum." R. 330. On examination, Bendlin exhibited hypersensitivity in the bilateral outer thighs, spasm and tenderness in the lumbar paraspinal muscles, and decreased reflexes at the right knee. She had good strength in both legs. Bendlin reported that Neurontin had been too sedating, so it was discontinued and a trial of Lyrica was prescribed. Her Lidoderm patches were increased to three patches per day. Bendlin was

instructed "to pursue a stretching and walking program in terms of physical therapy," and to continue with her aquatic therapy. Dr. Peterson noted, "At present she continues disabled for employment." *Id.*

Physical therapy notes for January 23, 2008, indicate that after attending eight sessions, Bendlin was "still presenting with left lateral shift and muscle guarding," but she was "transferring better in and out of chairs and on and off the plinth." R. 332. Her gait continued to be antalgic, and she could only single leg balance on the right for 20 seconds at a time, although this was noted to be an improvement over her initial visit. Her ranges of motion continued to be limited, and she continued to be tender to palpation throughout the lower lumbar area, more severe on the right. *Id.* She was directed to continue physical therapy two to three times weekly for an additional four weeks. R. 333.

At Bendlin's aquatic therapy appointment on February 4, 2008, she reported having severe pain over the weekend after doing light housework, buying groceries, and sitting on a folding chair for awhile at a birthday party. She stated she had had to lie down on the floor on her stomach for about an hour before her muscle spasms subsided. Notes indicate she moved quite slowly in the pool, and the therapist withheld weights and had her do some work with her upper extremities "for more resistance and core stabilization." R. 344.

Bendlin saw Dr. Peterson for followup on February 25, 2008. She reported continued difficulty with walking, lumbago, muscle weakness, and back pain, although she stated the physical therapy and aquatic therapy were somewhat helpful. She rated her pain at a 3 to 4 out of 10, escalating as the day progressed. On examination, she exhibited limited lumbosacral mobility, equal reflexes, good strength in the lower extremities, muscle guarding and spasm in the lumbar paraspinals, and limited lumbosacral mobility. Notes indicate Dr. Fox had deemed Bendlin not to be a surgical candidate. Dr. Peterson prescribed Flexeril and indicated Bendlin "continues disabled for employment." R. 346.

On March 11, 2008, Bendlin was seen for evaluation in the Spine Center at the Mayo Clinic. The doctor's examination notes indicate Bendlin exhibited significant pain behavior and overreacted somewhat to range of motion maneuvers. He noted, "She walks with an antalgic-type gait, favoring the right lower extremity and externally rotates the right hip so that her foot is almost at 90 degrees to the direction of movement. It is really unclear why she does this." R. 355. He reviewed the x-rays and agreed that Bendlin has degenerative changes most notably at L5-S1, and less notably at L4-5, with "a broad-based disk bulge/protrusion at both levels but no frank compression of the traversing nerve roots." She also "has some degenerative change in the thoracolumbar junctional region with old disk degeneration changes and mild osteophytes." R. 356.

She was diagnosed with "Chronic back greater than leg pain," "Chronic pain syndrome," and "Obesity/deconditioning." *Id.* With regard to the obesity/deconditioning, the doctor noted the following:

> I had a very honest discussion with Ms. Bendlin and her mother who accompanied her today. I do not think there is a surgery that is going to take her pain away and give her the result that she wants, and in my opinion, she would not likely be a good candidate for fusion or disk arthroplasty. She has a lot of pain behavior, and I talked very openly about features of chronic pain that can affect her perception of the pain. I believe she would best be treated in a comprehensive pain rehabilitation program that is centered on a cognitive approach and includes both graduated physical therapy and counseling. I do not know of a provider to refer her to near her home. I have offered a consultation in our Pain Rehabilitation Program, but she has declined because of distance.

> Unfortunately, we have little to offer otherwise for the type of pain she has. She has had reasonable attempts at treatment, both pharmacologically and physical therapy and injection therapy.

>I do not think that additional imaging or other tests would be
>of much help at this point.

R. 356-57.

On March 27, 2008, Mary Greenfield, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. She opined Bendlin would be able to lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand/walk with normal breaks for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and push/pull without limitation. She indicated Bendlin could never perform balancing activities, but she could perform all other postural activities occasionally. She should avoid concentrated exposure to vibration and hazards, but would have no other environmental limitations. R. 359-66. Herbert Waxman, M.D. reviewed the record on April 17, 2008, and concurred with Dr. Greenfield's assessment in all respects. R. 367-68.

Bendlin saw Dr. Peterson on April 14, 2008, for followup. She reported continued pain in her low back, shooting into her legs; and difficulty standing, sitting, walking, and lifting. She expressed a desire to wean herself off of narcotics, and Dr. Peterson recommended Lyrica. Notes indicate, "Vocational status is that she remains disabled." R. 409. Dr. Peterson referred Bendlin for a trial of acupuncture.

On April 30, 2008, Rex J. Jones, D.C. wrote a letter to the state agency regarding his recent treatment of Bendlin. He indicated she had been referred by Dr. Peterson for acupuncture treatments. Dr. Jones's examination of Bendlin revealed severely restricted lumbar range of motion, with pain on movement; weakness of the right hamstring and right quadriceps muscles; very guarded gait; positive Murphy's sign with pain on arising from a chair; and "significant muscle spasm across the lumbar spine and right buttocks region, right gluteal muscle tenderness, [and] pain on palpation along the right femur head both posterior and anterior." R. 369. Dr. Jones opined that Bendlin was "unemployable

14

at this time, [and] unable to lift, sit, stand, or walk any distance." R. 370. He had started acupuncture treatments with no change after three treatments.

On May 6, 2008, Bendlin underwent a diagnostic assessment at Seasons Center for Community Mental Health. She was diagnosed with Adjustment Disorder with Mixed Anxiety and Depression. She was scheduled for medication management sessions every other week, with goals of working through grief issues, learning to deal with stress, learning to modify her thinking, and being able to sleep through the night at least 60% of the time. R. 452-54.

On May 8, 2008, Dr. Pruitt wrote a letter to the state agency regarding his treatment of Bendlin. He summarized her treatment from August 2007 through April 29, 2008, but did not list any restrictions or provide any opinions regarding Bendlin's ability to sustain employment. R. 380-81. His notes indicate Bendlin's pain was a "chronic condition," and she should follow up with Dr. Peterson for pain management as needed. R. 382.

Bendlin returned to see Dr. Peterson for followup on May 15, 2008. Dr. Peterson suggested chiropractic and neurologic second opinions, and referred Bendlin to appropriate care providers. Notes indicate, "Certainly she remains disabled at this point." She also increased Bendlin's Lyrica dosage. R. 408.

Bendlin saw psychiatrist M. Christine Segreto, D.O. on June 3, 2008, for a mental status exam. Dr. Segreto diagnosed her with Major Depression, single episode, moderate, with anxiety, rule out Generalized Anxiety Disorder; and ADHD, Predominately Inattentive Type. Bendlin had psychosocial stressors including financial difficulties, household problems, stress regarding her children, and death of her significant other one year earlier. Dr. Segreto prescribed a trial of Cymbalta for anxiety, depression, and pain. She also was started on Adderall for ADHD. Her current GAF was estimated at 55. R. 448.

Dr. Peterson saw Bendlin again on June 12, 2008. Bendlin was noted to walk "dragging her leg," and to have "difficulty with moving her hips." She exhibited tenderness and muscle guarding in the lumbar paraspinals, and tenderness in the sacroiliac joints bilaterally. Notes indicate Bendlin had been started on Cymbalta by her psychiatrist, and Dr. Peterson indicated this was "a good choice for its pain relieving as well as antidepressive qualities." The doctor indicated Bendlin "remains disabled." R. 420.

On June 27, 2008, Chrystalla Daly, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. Her findings were identical to those from the previous records reviews. She noted that the Mayo Clinic exam had revealed 4/5 positive Waddell's signs, and the Mayo Clinic doctor had noted that Bendlin exhibited a great deal of pain behavior. Dr. Daly indicated, "This significantly erodes credibility." R. 412. Dr. Daly found Dr. Peterson's opinion that Bendlin "remains disabled is not supported based on exam as credibility is eroded." R. 413.

Bendlin saw Dr. Peterson on July 17, 2008, with continued complaints of severe low back pain radiating across her hips, shooting down both legs, and on the sides of both legs. On examination, Bendlin exhibited "[e]xquisite tenderness over the lumbar facets," pain on lumbar extension, hamstring tightness, limited lumbosacral mobility, and muscle guarding of the lumbar paraspinals. She had intact sensation and reflexes. Lyrica had not helped Bendlin's pain, so it was discontinued. She was referred for consultation to Dr. John Hansen of Sanford's Chronic Pain Center, and also was referred for lumbar facet injections. Notes indicate Bendlin was "trying to go on disability until she can get herself re-trained to do a different type of employment." R. 419.

Bendlin saw a counselor at Seasons Center on July 3 and July 24, 2008. R. 450-51. She saw Dr. Segreto on July 31, 2008, for medication management. Her Cymbalta was increased to 90 mg daily, and her current GAF was estimated at 57. R. 445. Bendlin saw a counselor on August 26, 2008, discussing her inability to relax. R. 449. On

September 10, 2008, her Cymbalta was increased to 120 mg daily, and her current GAF was estimated to be 56. R. 444. Her medications were continued without change on October 30, 2008, and her GAF again was estimated to be 56. R. 443. On January 8, 2009, her Adderall dosage was increased, and her current GAF was estimated to be 58. R. 442.

On March 12, 2009, Bendlin underwent a Functional Capacity Evaluation at Buena Vista Regional Medical Center in Storm Lake, Iowa. R. 477-88. The evaluator opined Bendlin could knee lift fifteen pounds occasionally; shoulder and waist lift ten pounds occasionally; and overhead lift five pounds infrequently. She could reach overhead and forward frequently; bend and climb stairs infrequently; and never bend. She could sit infrequently for twenty-five minutes at a time; static stand infrequently for eighteen minutes at a time; and dynamic stand occasionally for thirty minutes at a time. The evaluator listed the following summary of findings:

1.  Patient demonstrated a limping gait throughout the evaluation. However, at the end of the session patient's limping progressed to foot dragging, with an inability to dorsiflex the foot to bring it forward during gait. However, when patient was manually tested by the evaluator, she displayed normal manual muscle resistance for dorsiflexion, inversion, eversion and plantar flexion of the ankle. Thus, there is no explanation as to why she would demonstrate this type of gait. She also demonstrated inconsistency with this behavior when walking out of the rehab to leave.

2.  Patient described pain levels of 8.0 out of 10 toward the end of the exam. A pain level of 8 indicates an emergency-type pain with a pain level of 10 being the worst pain imaginable. She was laughing and joking with the evaluator throughout this evaluation.

3.  Patient demonstrated possible abnormal illness behavior with questionnaires and tests designed to determine symptom magnification and inappropriate illness behavior. On Waddell's questionnaire, a total of 2 or more inappropriate scores is indicative of inappropriate illness behavior. She

scored 4/5 for inappropriate answers. On Waddell's distraction tests, she reported inappropriate increase in pain to s[t]imulation, tenderness, distraction, and regional disturbance. Three or more tests that are positive indicate that she is demonstrating pain that has no apparent organic basis. On McGills Pain Questionnaire, a score of >30 indicates poor psychodynamics. She scored 49, indicating significant symptom magnification.

4. Patient's cogwheeling-type movements during ROM of the spine are not typical of any type of back injury and could be described as an inappropriate illness behavior.

5. There were no corresponding changes in biomechanics with increasing load to determine true maximum potential with material handling tasks.

6. Patient's perception of her injury on the Spinal Sort places her at below the 5th percentile compared with other unemployed female patients. This indicates that she may self-limit during participation in the evaluation and in rehabilitation. Patient did appear to self-limit on material handling and work activities during the FCE. It is also of note that she has reported very little to no improvement with various treatments such as physical therapy and aquatic therapy.

7. Based on above findings, it is problematic to determine patient's true maximum physical capabilities due to symptom magnification and inappropriate illness behavior.

R. 488.

## *Summary of ALJ's Decision*

The ALJ found Bendlin has not engaged in substantial gainful activity since September 21, 2007, her alleged disability onset date. He found her to have severe impairments consisting of a bulging disc at L4-5 and obesity, but he further found that her impairments, singly or in combination, do not equal one of the listed impairments in the regulations. He further found that although Bendlin's "anxiety and depression are 'severe' medically determinable mental impairments, . . . the record does not support a finding that

these mental impairments have significantly limited (or are expected to significantly limit) [Bendlin's] ability to perform basic work-related mental activities for the requisite durational requirement of 12 consecutive months or more[.]" R. 13. The ALJ noted Bendlin's mental impairments appear to be improving with treatment, and they cause her no restriction of the activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

The ALJ found Bendlin "has the residual functional capacity to perform less than the full range of light work," with the following restrictions:

> The claimant is limited to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently. The claimant is limited to sitting (with normal breaks) for a total of about 6 hours of an 8-hour workday. The claimant is limited to standing and/or walking (with normal breaks) for a total of about 6 hours of an 8-hour workday. The claimant has no limitation in performing push and/or pull activities (including operation of hand and/or foot controls). The claimant is limited to never climbing ladders, ropes or scaffolds; and climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling on an occasional basis. The claimant must avoid concentrated exposure to extreme cold, vibration, and hazards including moving machinery and unprotected heights.

R. 14.

The ALJ found Bendlin's statements regarding the intensity persistence, and limiting effects of her symptoms were not fully credible. He noted Bendlin's "treatment history demonstrates that [she] has attempted to alleviate her back pain with prescribed medications, epidural injections, physical therapy, TENS unit, and chiropractic treatment," and her "descriptions of her restricted activities of daily living contained in the record also are generally consistent with her allegations of disabling pain." R. 15. However, the ALJ gave greater weight to "expert opinions from medical specialists and

findings that are clearly inconsistent with the claimant's allegations." *Id.* In particular, the ALJ noted that the Mayo Clinic doctor had expressed "some doubts about the claimant's subjective reports after the physical examination," noting Bendlin had "a 'great deal of pain behavior' during the physical examination, and [she] walked with an antalgic-type gait but it was 'unclear why she does this[.]'" R. 16. The ALJ further noted that the occupational therapist who performed the functional capacity evaluation was unable to reach any definitive conclusions due to "unreliable" test result. Bendlin was noted to be "laughing and joking during the evaluation, which was inconsistent with her reported pain level of 8 indicating an emergency-type pain[.]" *Id.*

Based on his findings with regard to Bendlin's residual functional capacity, the ALJ concluded that Bendlin "is capable of performing past relevant work as a small products assembler and cashier checker," neither of which would "require the performance of work-related activities precluded by [Bendlin's] residual functional capacity[.]" R. 18. He therefore concluded Bendlin is not disabled. R. 20.

### *Discussion*

Bendlin argues the ALJ's reliance on the state agency consultants' findings were at odds with her testimony and the opinions of all of her treating physicians. She notes that both Dr. Daly and Dr. Greenfield appeared to indicate Bendlin likely could be "expected to be disabled at least from 9/21/07 to 9/21/08," but the ALJ had failed to address those comments by the consultants. Doc. No. 10, pp. 4-5.

Bendlin further notes that Dr. Pruitt imposed specific restrictions on her that were never lifted, and were never questioned by any other treating physician. Dr. Pruitt's restrictions included no lifting over twenty-five pounds; only occasional standing, walking, and sitting; and no standing, walking, or sitting for more than two hours without a break.

*See* R. 282. Dr. Peterson also opined throughout her treatment of Bendlin that Bendlin was "disabled" for employment purposes.

Based on the records and opinions of her treating physicians, Bendlin argues a "preponderance of the medical evidence" of record supports a finding of disability, and substantial evidence in the record does not support the ALJ's decision. Doc. No. 10.

The Commissioner first argues Bendlin has cited the wrong standard of review, noting that "substantial evidence on the record as a whole" is "less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion." Doc. No. 12 (citing *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008)). The Commissioner argues that when substantial evidence in the record supports the Commissioner's decision, the court may not reverse that decision "either because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently." *Id.* (citing, *inter alia*, *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001), and *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) ("[E]ven if inconsistent conclusions may be drawn from the evidence, the decision will be affirmed where the evidence as a whole supports either outcome.")).

The Commissioner argues the ALJ properly assessed Bendlin's credibility, noting "numerous physical examination and evaluation findings that were inconsistent with [Bendlin's] claims of disabling pain." Doc. No. 12, p. 16. He notes the record contains several instances where doctors, therapists, and evaluators noted Bendlin had exhibited symptom magnification, inconsistent gait, and other behaviors inconsistent with her claim of disabling pain. The Commissioner further argues Bendlin implicitly admitted that she was not disabled from all employment when she told Dr. Peterson she was trying to get disability benefits "until she can get herself re-trained to do a different type of employment." Doc. No. 12 (quoting R. 419). The Commissioner further asserts the ALJ

properly evaluated the medical evidence in determining Bendlin's residual functional capacity.

The court finds the Commissioner's statement of the issues and the controlling law to be accurate, and his arguments to be persuasive. The record indicates Bendlin has had ongoing problems with back pain since her initial fall in December 2006, exacerbated by her fall in July 2007. She has consistently sought treatment for pain, with no lasting positive results. However, the record also indicates she has magnified her pain and she gave an inconsistent effort during her functional evaluation that prevented the evaluator from reaching any reliable conclusions. In addition, she has failed to follow her doctors' advice regarding consistent exercise and weight loss, both of which her doctors believe would ease her pain to some degree.

This clearly is a case where the record could support two inconsistent conclusions. In such a case, when the court reviews the evidence and finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003); *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page v. Astrue*, 484 F.3d

1040, 1042-43 (8th Cir. 2007) (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

Because the court finds substantial evidence supports the Commissioner's decision that Bendlin is not disabled, the Commissioner's decision is **affirmed**, and judgment will be entered in his favor and against Bendlin.

**IT IS SO ORDERED.**

**DATED** this 21st day of January, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT